UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

_____
                                                    )
CG TECHNOLOGY DEVELOPMENT, LLC   )
et al.,                                             )
                                                    )
                  Plaintiffs,                       )          2:16-cv-00857-RCJ-VCF
                                                    )
         vs.                                        )
                                                    )              ORDER
BIG FISH GAMES, INC.,                               )
                                                    )
                  Defendant.                        )
_____)

          This case arises out of the alleged infringement of seven patents. Pending before the

Court is a Motion to Dismiss (ECF No. 32). For the reasons given herein, the Court grants the

motion.

I.       FACTS AND PROCEDURAL HISTORY

          Plaintiff CG Technology Development, LLC ("CG Tech") is a wholly owned subsidiary

of non-party CG Technology, L.P. ("CG"), which provides technology solutions for lottery,

gaming, racing, and sports wagering. (Compl. ¶ 2, ECF No. 1). "[CG] specializes in providing

secure, scalable, mobile technology and risk management solutions to integrated resorts, gaming

partners, race and sports books, and lottery industries." (*Id.*). CG and CG Tech produce mobile

phone applications for real-money and social casino gaming, as well as account-based wagering

systems. (*Id.*).

Plaintiffs CG Tech, Interactive Games Limited ("IG Limited"), and Interactive Games LLC ("IG LLC") are the assignees of U.S. Patent Nos. RE39,818; 6,899,628; 7,534,169; 6,979,267; 8,342,924; 7,029,394, and 9,111,417. The seven patents involve various aspects of social casino gaming which allows users to play casino games on mobile computing devices along with other users through an online community. (*Id.* ¶ 12). Defendant Big Fish Games, Inc. ("Big Fish") is the largest producer and distributor of social games. (*Id.* ¶ 13). Big Fish offers many types of social casino games to users, including slots, roulette, blackjack, and poker. (*Id.* ¶ 14). Plaintiffs allege that Defendant infringes one or more claims of the seven patents-in-suit under 35 U.S.C. § 271. Plaintiffs also allege willful infringement against Defendant.

Defendant moves the Court to dismiss Plaintiffs' infringement claims for failure to state a claim, arguing primarily that under *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014), each patent is patent-ineligible because it is directed to an abstract idea and does not contain an inventive concept. Defendant also moves the Court to dismiss the willful infringement claim for failure to state a claim.

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the

complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation "plausible," not just "possible." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). That is, a plaintiff must not only specify or imply a cognizable legal theory, but also must allege the facts of the plaintiff's case so that the court can determine whether the plaintiff has any basis for relief under the legal theory the plaintiff has specified or implied, assuming the facts are as the plaintiff alleges (*Twombly-Iqbal* review).

## III.   ANALYSIS

### A.   Patentable Inventions and the *Alice* Standard

Under Section 101 of the Patent Act, an inventor may obtain a patent on "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, the Supreme Court "ha[s] long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The driving concern behind this exclusionary principle is one of pre-emption—

1   ""'that patent law not inhibit further discovery by improperly tying up the future use of' these

2   building blocks of human ingenuity." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus*

3   *Labs., Inc.*, 132 S. Ct. 1289, 1301 (2012)). Notably, though, "an invention is not rendered

4   ineligible for patent simply because it involves an abstract concept," *id.*; "[a]pplications of such

5   concepts to a new and useful end . . . remain eligible for patent protection," *id.* (internal

6   quotations and alterations omitted). In other words, "in applying the § 101 exception, [courts]

7   must distinguish between patents that claim the building blocks of human ingenuity and those

8   that integrate the building blocks into something more, thereby transforming them into a patent-

9   eligible invention." *Id.* (internal quotations and alterations omitted).

10          To address these competing concerns, the Supreme Court has adopted a two-step

11   framework for "distinguishing patents that claim . . . abstract ideas from those that claim patent-

12   eligible applications of those concepts." *Id.* at 2355. First, a court determines whether the claim

13   is "directed to one of those patent-ineligible concepts," *id.*, such as the concept of abstract ideas,

14   which "embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (quoting

15   *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) (internal quotations and alterations omitted)).

16   Second, if the patent is directed to a patent-ineligible concept, then a court examines the

17   elements of each claim "both individually and 'as an ordered combination,'" *id.* at 2355 (quoting

18   *Mayo*, 132 S. Ct. at 1298), "to determine whether it contains an 'inventive concept' sufficient to

19   'transform' the claimed abstract idea into a patent-eligible application," *id.* at 2357 (quoting

20   *Mayo*, 132 S. Ct. at 1294, 1298). This transformation "requires 'more than simply stating the

21   abstract idea while adding the words 'apply it.''" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

22          A district court may determine whether a patent is eligible under § 101 at the dismissal

23   stage. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348–49 (Fed. Cir.

24

2015) (affirming a district court's granting of a motion to dismiss based on § 101). Plaintiffs

argue that to invalidate a patent under § 101 requires clear and convincing evidence. They cite

two published cases to support their argument. In the first case, however, the only mention of the

requirement of a standard of clear and convincing evidence was in a concurring opinion. *See CLS*

*Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1304–05 (Fed. Cir. 2013, Rader, C.J., concurring

in part and dissenting in part). In a separate concurring opinion, Judge Lourie determined that

patent claims should receive a presumption of validity when § 101 is raised as a basis for

invalidity. *Id.* at 1284. However, there was no majority opinion on the issue in the case, and as

Chief Judge Rader observed, "[t]hough much is published today discussing the proper approach

to the patent eligibility inquiry, nothing said today beyond our judgment has the weight of

precedent." *Id.* at 1292, n. 1 (Rader, C.J., concurring in part and dissenting in part). Furthermore,

the Supreme Court affirmed the Federal Circuit's decision in *Alice*, but it did not discuss the

issues of presumption of validity and burden of proof in its § 101 analysis. *See* 134 S. Ct. at

2354–60.

    In the other case, the Federal Circuit held that "any attack on an issued patent based on a

challenge to the eligibility of the subject matter must be proven by clear and convincing

evidence." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013). However,

*Ultramercial* lacks precedential effect because the Supreme Court vacated the judgment in the

case "for further consideration in light of *Alice*." *WildTangent, Inc. v. Ultramercial, LLC*, 134 S.

Ct. 2870 (2014). On remand, the Federal Circuit reconsidered the validity issue in light of *Alice*

and affirmed the district court's ruling dismissing the patent claims while not discussing any

presumption of validity or standard of clear and convincing evidence. *Ultramercial, Inc. v. Hulu,*

*LLC*, 772 F.3d 709, 716–17, 720 (Fed. Cir. 2014). In a concurring opinion, Judge Mayer stated

1    that "no presumption of eligibility should attach when assessing whether claims meet the

2    demands of section 101." Ultramercial, 772 F.3d at 720 (Fed. Cir. 2014) (Mayer, J., concurring).

3            As these cases demonstrate, and as several courts have noted, there is uncertainty as to

4    whether a presumption of invalidity or a clear and convincing standard applies in § 101

5    challenges. *See, e.g.*, *Esoterix Genetic Labs. LLC v. Qiagen Inc.*, 133 F. Supp. 3d 349, 355 (D.

6    Mass. 2015); *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 932 (W.D. Tex.

7    2015); *Communique Lab., Inc. v. Citrix Sys., Inc.*, 151 F. Supp. 3d 778, 786–87 (N.D. Ohio

8    2015). This Court agrees with other district courts that the most reasonable approach is to apply a

9    clear and convincing standard to invalidity defenses under § 101 when the analysis involves

10   underlying factual issues but not when it involves purely legal issues, *see Communique Lab*, 151

11   F. Supp. 3d at 786–87; *Affinity Labs*, 109 F. Supp. 3d at 932–33, although the Court does not

12   expect many, if any, factual issues to arise at this stage of the litigation.

13           **B.      The '924 Patent**

14           The '924 Patent claims "[a] system for providing enhanced services to users of a gaming

15   application," ('924 Patent, Abstract, 3, ECF No. 1-2), in which a memory device coupled to a

16   processor receives information from a user's activities, generates statistics associated with the

17   user, and electronically displays the statistics to another user ('924 Patent, Claim 11, at 28). The

18   '924 Patent has three independent claims (Claims 1, 11, 16) and seventeen dependent claims.

19   (*See id.* at 27–28). Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the

20   '924 Patent by arguing that Claim 11 of the Patent is patent ineligible under *Alice*.

21           1.      *Alice* Step 1

22           Claim 11 reads:

23           An apparatus comprising:

24

at least one processor; and at least one memory device electronically coupled to the at least one processor, wherein the at least one memory device stores instructions which, when executed by the at least one processor, direct the at least one processor to: receive information associated with at least one event initiated by a user within a context of playing a game, wherein the information is received during the playing of the game by the user; based at least in part on the information, generate statistics information, wherein the statistics information is associated with the user with respect to the playing of the game; and cause to be electronically displayed to another user at least the statistics information.

('924 Patent, Claim 11, at 28). In brief, this claim involves three aspects: (1) a memory device coupled to a processor that receives information about a user's activities while playing a game; (2) the generation of statistics associated with the user's activities; and (3) an electronic display of those statistics to other users.

Claim 11 is directed to the abstract concept of displaying statistics based on a user's gaming activities. The Federal Circuit has held that collecting, recognizing, and storing data is an abstract idea because it is a concept that is "undisputedly well-known" and "humans have always performed these functions." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). Similarly, generating statistics based on collected data is a well-known concept that humans have long performed. The same applies to displaying statistics to interested parties, whether by the use of physical objects, handwriting, print, or other means. Certainly, the electronic display of statistics was not a new concept when Plaintiffs submitted this claim, nor do they claim it to be.

In *Bilski v. Kappos*, the Supreme Court held that a method for hedging against the financial risk of price fluctuations was an abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." 561 U.S. 593, 611 (2010) (internal quotation omitted). To analogize to *Bilski*, the concept here involves "fundamental . . . practice[s] long prevalent in [data analysis and

technology].” *Alice*, 134 S. Ct. at 2356 (quoting *Bilski*, 561 U.S. at 611). In *Alice*, the Supreme Court stated that “hedging is . . . a method of organizing human activity.” 134 S. Ct. at 2356. Although the concept here is different from hedging, it is also a method of organizing human activity: the computer components collect and share data among users based on their activities to help them interact in the gaming context. This process uses long-established concepts to facilitate this interaction. Claim 11 is directed to an abstract idea that is not patentable.

2.     *Alice* Step 2

The elements of Claim 11 do not contain an inventive concept that would transform the abstract idea into a patent-eligible application. The only limitations on the abstract idea include the involvement of a processor, memory device, and computing device. These physical devices are used to implement the abstract idea. As in *Alice*, Claim 11 “merely require[s] generic computer implementation, [which] fail[s] to transform that abstract idea into a patent-eligible invention.” 134 S. Ct. at 2357. The technology involved simply carries out the tasks of collecting data from a user’s gaming activities and then using that data to generate and display statistics. As with the claims at issue in *Alice*, “each step does no more than require a generic computer to perform generic computer functions.” *Id.* at 2359; *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363–64 (Fed. Cir. 2015) (holding that gathering statistics generated during testing about how potential customers respond to offers does not provide a meaningful limitation because “[t]hese processes are well-understood, routine, conventional data-gathering activities”).

Moreover, “[c]onsidered ‘as an ordered combination,’ the computer components . . . ‘add nothing that is not already present when the steps are considered separately.’” *Id.* (alteration omitted) (quoting *Mayo*, 132 S. Ct. at 1298). For example, Claim 11 “do[es] not . . . purport to improve the functioning of the computer itself . . . [n]or do[es] [it] effect an improvement in any

other technology or technical field." *Id.* Rather, the claim "amount[s] to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer." *Id.* at 2360 (quoting *Mayo*, 132 S. Ct. at 1298). In other words, the claim does nothing "'more than simply stating the abstract idea while adding the words 'apply it.'"" *Id.* at 2357 (alterations omitted) (quoting *Mayo*, 132 S. Ct. at 1294).

Claim 11 is directed to an abstract idea that does not contain an inventive concept sufficient to transform it into a patent-eligible application. The '924 Patent is patent-ineligible.

Plaintiffs argue that the Court must evaluate each claim of the '924 Patent individually. Although the Complaint alleges infringement of "at least claim 11 of the '924 patent," (Compl. ¶¶ 63–64), Claim 11 is representative of the other claims because "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). In addition, although Plaintiffs argue that Defendant "disregards the requirement that eligibility be considered on a claim-by-claim basis," (Resp., 7, ECF No. 30), Plaintiffs do not attempt to identify any claims in its opposition that it believes would not be fairly represented by Claim 11. *See Content Extraction*, 776 F.3d at 1348. Because the claims "are substantially similar in that they recite little more than the same abstract idea," the Court need not address each claim of the asserted patent. *Id.*

C.    **The '267 Patent**

The '267 Patent claims "[a] system for generating profile information for users of a gaming application," ('267 Patent, Abstract, 68, ECF No. 1-1), in which a server monitors users' gaming events, a processor "substantially simultaneously" receives the events information from the server and generates profile information associated with the users, and a memory device stores the profile information, ('267 Patent, Claim 1, at 89). The '267 Patent has three

independent claims (Claims 1, 14, 23) and twenty-eight dependent claims. (*See id.* at 89–91).

Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '267 Patent by

arguing that Claim 1 of the Patent is patent ineligible under *Alice*.

      1.    *Alice* Step 1

Claim 1 reads:

> A system for generating profile information for users of gaming applications comprising:
>
> A server that: executes a first gaming application; monitors a plurality of game events during the execution of the first gaming application by a first user; communicates first event information associated with a first game event; communicates second event information associated with a second game event; and
>
> a processor remotely coupled to the server that: receives the first event information; receives the second event information; generates first profile information associated with the first user based at least in part upon the first event information, the second event information and wager records of the first user; receives third event information substantially simultaneously with the first event information, the third event information associated with a third game event, wherein the third game event is associated with the execution by a second user of a second gaming application; receives fourth event information associated with a fourth game event, wherein the fourth game event is associated with the execution by the second user of the second gaming application; and generates second profile information associated with the second user based at least in part upon the third event information and the fourth event information; and
>
> a memory coupled to the processor that stores the first profile information.

(*Id.* at 89). In brief, this claim involves three aspects: (1) a server that monitors users' gaming

events; (2) a processor that "substantially simultaneously" receives the events information from

the server and generates profile information associated with the users; and (3) a memory device

that stores the profile information.

      Claim 1 is directed to the abstract concept of generating user profiles based on users'

gaming activities. The Court's analysis here is similar to its analysis for the '924 Patent. Claim 1

is directed to collecting, recognizing, and storing data—a concept that is "undisputedly well-known" and that involves functions that "humans have always performed." *Content Extraction*, 776 F.3d at 1347. Similarly, observing a user's gaming activities and generating information about the user based on his or her activities is a task humans have long performed. Defendant provides an apt example of a golf caddy performing these tasks without a machine. (*See* Mot., 17). Plaintiffs argues that the claim is not directed to an abstract idea because the server "is able to receive event information associated with multiple other users on executing games on different servers 'substantially simultaneously' with the process of collecting and profiling a first user." (Resp., 21–22). While the server is able to perform a task faster or more efficiently than a human can, this fact does not change the abstract nature of the concept. Although more efficient, the concept is still directed to a "fundamental . . . practice long prevalent in [data analysis and technology]," *Alice*, 134 S. Ct. at 2356 (quoting *Bilski*, 561 U.S. at 611), and "a method of organizing human activity," *id.* Claim 1 is directed to an abstract idea that is not patentable.

2.      *Alice* Step 2

The elements of Claim 1 do not contain an inventive concept that would transform the abstract idea into a patent-eligible application. The only limitations on the abstract idea are that it involves a server, processor, and memory device. These physical devices are used to implement the abstract idea. As in *Alice*, Claim 11 "merely require[s] generic computer implementation, [which] fail[s] to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2357. The technology involved simply carries out the tasks of collecting data from users' gaming activities and using the data to generate user profiles.

As with the claims at issue in *Alice*, "each step does no more than require a generic computer to perform generic computer functions." *Id.* at 2359; *see also Intellectual Ventures I*

1   *LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) (noting that "a database,

2   a user profile . . ., and a communication medium, are all generic computer elements). For

3   example, Claim 1 "do[es] not . . . purport to improve the functioning of the computer itself . . .

4   [n]or do they effect an improvement in any other technology or technical field." *Alice*, 134 S. Ct.

5   at 2359. The claim does not describe the server's ability to complete operations "substantially

6   simultaneously" as an improvement in server technology; rather, the claim "amount[s] to

7   'nothing significantly more' than an instruction to apply the abstract idea . . . using some

8   unspecified, generic computer." *Id.* at 2360 (quoting *Mayo*, 132 S. Ct. at 1298). The claim does

9   nothing "'more than simply stating the abstract idea while adding the words 'apply it.''" *Id.* at

10  2357 (alterations omitted) (quoting *Mayo*, 132 S. Ct. at 1294).

11         Claim 1 is directed to an abstract idea that does not contain an inventive concept

12  sufficient to transform it into a patent-eligible application. The Court finds that Claim 1 is

13  representative of the other claims because they are "substantially similar and linked to the same

14  abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). Also, Plaintiffs

15  have not identified any claims that would not be fairly represented by Claim 1. *See id.* The '267

16  Patent is patent-ineligible.

17         **D.     The '628 Patent**

18         The '628 Patent claims "[a] system for managing game events," ('628 Patent, Abstract,

19  13, ECF No. 1-1), in which a processor executes a gaming application, a monitor module

20  monitors game events, and an interface that communicates event information to an enhanced

21  services platform generates the users' wager record, ('628 Patent, Claim 31, at 36). The '628

22  Patent has four independent claims (Claims 1, 13, 23, 31) and thirty-two dependent claims. (*See*

23

24

*id.* at 34–36). Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '628 Patent by arguing that Claim 31 of the Patent is patent ineligible under *Alice*.

      1.    *Alice* Step 1

Claim 31 reads:

> A server for managing game events, comprising:
>
> a processor that executes a gaming application that is accessed by a remote user via a network; a monitor module coupled to the processor that monitors a plurality of game events during the execution of the gaming application by the user; and an interface coupled to the processor that communicates event information associated with at least one of the game events to an enhanced services platform remote from the server such that the platform may generate a wager record associated with a wager between a plurality of users based on at least one of the first event information and the second event information.

(*Id.* at 36). In brief, this claim involves three aspects: (1) a processor that executes a gaming application; (2) a monitor module that monitors game events; and (3) an interface that communicates event information to an enhanced services platform to generate the users' wager record.

      Claim 31 is directed to the abstract concept of using information from game events to manage wagers. As above, Claim 31 is directed to monitoring, collecting, recognizing, and storing data—a concept that is "undisputedly well-known" and that involves functions that "humans have always performed." *Content Extraction*, 776 F.3d at 1347. Similarly, using game event information to generate other information to help manage wagers during the game are tasks humans have long performed. As Defendant argues, the claim essentially describes taking note of wagers during a game, whether mentally or using pen and paper, communicating the results, and using the results to process wagers.

      Plaintiffs argue that the Court cannot meaningfully analyze Claim 31 until it construes the meaning of "enhanced services platform"; however, a portion of the specification describes

the platform in this way: "During the enhanced services session, platform may provide event management, statistics generation, and user profiling services to the user . . . . Other exemplary enhanced services include providing game advice, placing and settling wagers, and matching users . . . in an 'intelligent lobby.'" ('628 Patent, 6:16-23, at 27). This description provides sufficient information for the Court to conclude that the enhanced services platform merely performs basic tasks already discussed, along with the tasks of providing game advice, managing wagers, and matching participants, which are also tasks that humans regularly perform in gaming. Plaintiffs have not offered any other reason for the Court to doubt its ability to ascertain the basic character of the phrase "enhanced services platform" without claim construction. Claim 31 is directed to an abstract idea that is not patentable.

2.    *Alice* Step 2

The elements of Claim 31 do not contain an inventive concept that would transform the abstract idea into a patent-eligible application. The only limitations on the abstract idea are that it involves a server, processor, monitor module, and interface. As with the patents above, these devices are used to implement the abstract idea. As in *Alice*, Claim 31 "merely require[s] generic computer implementation, [which] fail[s] to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2357. The technology involved simply carries out the tasks of monitoring game events and generating information based on the game events to manage wagers. Nothing about the claim suggests that it "purport[s] to improve the functioning of the computer itself . . . or . . . effect an improvement in any other technology or technical field." *Id.* at 2359. In other words, the claim does not do "'more than simply stating the abstract idea while adding the words 'apply it.''" *Id.* at 2357 (alterations omitted) (quoting *Mayo*, 132 S. Ct. at 1294).

Claim 31 is directed to an abstract idea that does not contain an inventive concept sufficient to transform it into a patent-eligible application. The Court finds that Claim 31 is representative of the other claims because they are "substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). Also, Plaintiffs have not identified any claims that would not be fairly represented by Claim 1. *See id.* The '628 Patent is patent-ineligible.

E.      **The '394 Patent**

The '394 Patent claims "[a] system for generating statistics information," ('394 Patent, Abstract, 31, ECF No. 1-2), in which a server monitors gaming events and communicates information about those events to a processor which generates statistics based on the events and determines an outcome of a wager using the statistics, ('394 Patent, Claim 1, at 52). The '394 Patent has five independent claims (Claims 1, 13, 30, 42, 44) and thirty-nine dependent claims. (*See id.* at 52–54). Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '394 Patent by arguing that Claim 1 of the Patent is patent ineligible under *Alice*.

1.      *Alice* Step 1

Claim 1 reads:

A system for generating statistics information, comprising:

a server that: executes a gaming application; monitors a plurality of game events during the execution of the gaming application by a user; communicates first event information associated with a first game event; and communicates second event information associated with a second game event;

a processor remotely coupled to the server that: receives the first event information; receives the second event information; generates statistics information based at least in part upon the first event information, the second event information and wager records associated with the gaming application; and determines an outcome of a wager associated with the gaming application using the statistics information; and

a memory coupled to the processor that stores the statistics information.

(*Id.* at 52). In brief, this claim involves three aspects: (1) a server that executes a game, monitors game events, and communicates event information to a processor; (2) a processor that receives the event information, generates statistics based on the information, and determines the outcome of a wager using the statistics; and (3) a memory device that stores the statistics information.

Claim 1 is directed to the abstract concept of determining the outcome of wagers based on game statistics. Again, Claim 1 is directed to monitoring, collecting, recognizing, and storing data—a concept that is "undisputedly well-known" and that involves functions that "humans have always performed." *Content Extraction*, 776 F.3d at 1347. Similarly, generating statistics based on collected data is a well-known concept that humans have long performed. Also, in the gaming industry humans have long determined the outcomes of wagers based on game information and statistics as part of facilitating wagering.

Plaintiffs argue that the server is designed to improve upon drawbacks in online gaming that existed prior to 2001 by presenting real-time information and capturing historical data generated in multiple gaming platforms. While this might be true, making a process or task that humans regularly perform more efficient does not change the nature of what the claim is directed to accomplishing. Claim 1 is directed to an abstract idea that is not patentable.

2.    *Alice* Step 2

The elements of Claim 1 do not contain an inventive concept that would transform the abstract idea into a patent-eligible application. The only limitations on the abstract idea are that it involves a server, processor, and memory device. As with the patents above, these devices are used to implement the abstract idea. As in *Alice*, Claim 1 "merely require[s] generic computer implementation, [which] fail[s] to transform that abstract idea into a patent-eligible invention."

134 S. Ct. at 2357. The technology involved simply carries out the tasks of monitoring game events, communicating information about those events, generating statistics, and determining the outcome of wagers. While the server might making generating statistics and determining the outcome of wagers more efficient by using "a unique network server," (Resp., 25), the claim does not suggest that it "purport[s] to improve the functioning of the [server] itself . . . or . . . effect an improvement in any other technology or technical field." *Alice*, 134 S. Ct. at 2359.

Claim 1 is directed to an abstract idea that does not contain an inventive concept sufficient to transform it into a patent-eligible application. The Court finds that Claim 1 is representative of the other claims because they are "substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). Claims 13 and 30 are also directed to determining the outcome of wagers. In contrast, Claim 42 is directed to "present[ing] a wager window to the user based on the statistics information to generate a wager offer," ('394 Patent, Claim 42, at 54), and Claim 44 is directed to "determin[ing] wager preferences of the user based on the statistics information," ('394 Patent, Claim 44, at 54). However, these claims are similarly directed to performing tasks that humans in the gaming industry, or elsewhere, have long performed. They also do not contain an inventive concept. The '394 Patent is patent-ineligible.

### F.      The '417 Patent

The '417 Patent claims "[a] system for providing enhanced services to users of a gaming application," in which a server executes a gaming application and a platform provides enhanced services at user's request. ('417 Patent, Abstract, 57, ECF No. 1-2). The '417 Patent has eight independent claims (Claims 1, 12, 13, 14, 24, 34, 35, 36) and thirty-seven dependent claims. (*See*

1   *id.* at 81–84). Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '417

2   Patent by arguing that Claim 1 of the Patent is patent ineligible under *Alice*.

3           1.      *Alice* Step 1

4           Claim 1 reads:

5           A system comprising at least one processor and at least one non-volatile memory
            having software stored thereon that when executed by the at least one processor
6           directs the at least one processor to:

7           provide a game via a communications network to users via respective computing
            devices of the users, wherein the game is a sports game, an arcade game, a card
8           game, or an adventure game;

9           responsive to a request from one of the users, cause a graphical user interface to
            be presented to the user at the user's computing device, wherein the graphical user
10          interface allows the user to offer a wager to other users;

11          responsive to presenting the graphical user interface to the user, receive from that
            user a request to generate a wager offer, wherein the wager offer includes a wager
12          amount;

13          responsive to receiving the request to generate the wager offer, present the wager
            offer to other users via respective computing devices of the other users;
14
            receive from a plurality of the other users an acceptance of the wager offer, each
15          acceptance at the wager amount;

16          during a playing of the game by a plurality of the users: generate statistics
            information related to at least a first and a second of the users playing the game;
17          cause at least a portion of the statistics information of the first user to be presented
            to the second user via a respective computing device of the second user; and cause
18          at least a portion of the statistics information of the second user to be presented
            via a respective computing device of the first user; and
19
            at the end of the game, determine an outcome of the wagers resulting from the
20          users that accepted the wager offer, wherein to determine the outcome of the
            wagers includes to transfer funds to at least one user who played the game.
21
    (*Id.* at 81). In brief, this claim involves five aspects: (1) providing a game to users; (2) using a
22
    graphical user interface to allow a user to offer a wager for a specific amount to other users; (3)
23
    allowing other users to accept the wager offer; (4) generating statistics information related to the
24

users and causing it to be presented to users; and (5) determining an outcome of the wagers and

transferring funds to a user.

Claim 1 is directed to the abstract concept of facilitating wagering in a game. This claim

presents only two aspects the Court has not yet addressed: allowing users to offer and accept

wagers and transferring funds to a user. Like determining the outcome of wagers, these tasks are

also directed to facilitating wagering in the gaming industry and then transferring funds to a user.

Like the others, these concepts are ones that humans have long performed as fundamental

practices of the gaming industry. *See Alice*, 134 S. Ct. at 2356 (fundamental practices long

prevalent in an industry are abstract ideas). Plaintiffs argue that the '417 Patent claims have

overcome post-*Alice* rejections from the United States Patent Office ("USPTO") on their

pathway to allowance, but Defendant provides a USPTO communication finding that a number

of the claims "do not amount to significantly more than an abstract idea," while not identifying

what the abstract idea is. (USPTO Communication, 4, ECF No. 35-2). Claim 1 is directed to an

abstract idea that is not patentable.

2.    *Alice* Step 2

The elements of Claim 1 do not contain an inventive concept that would transform the

abstract idea into a patent-eligible application. The only limitations on the abstract idea are that it

involves a non-volatile memory device, communications network, computing devices, and

graphical user interface, which are generic computer devices used to implement the abstract idea.

Plaintiffs argue that making information available to remote competitors and real-time visual

observation of geographically remote competitors are unique features that transform the abstract

idea into a patent-eligible concept. However, the claim does not suggest that the users must be

geographically remote, nor does it suggest that it makes any improvement to the technology

involved. Rather, the claim suggests that it uses existing technology to facilitate wagering by transmitting information over a network to users of a gaming application. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

Claim 1 is directed to an abstract idea that does not contain an inventive concept sufficient to transform it into a patent-eligible application. The Court finds that Claim 1 is representative of the other claims because they are "substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). Some of the other claims are directed to different, albeit related, concepts, such as "compar[ing] the statistics information and the profile information associated with the user," ('417 Patent, Claim 12, at 82); "determin[ing] whether the least one user is cheating," ('417 Patent, Claim 13, at 82); and "match[ing] the first user against the second user in a competition based . . . upon the comparison of" profile information ('417 Patent, Claim 14, at 82). Comparing statistics and profile information to match users and determine whether a user is cheating are directed to collecting, recognizing, and processing data to accomplish tasks that humans have long performed. Also, in many games organizers match up participants based on their past activity and can often discern based on their activity whether a participant is cheating. These other claims also do not suggest that they have made any improvement to technology. The '417 Patent is patent-ineligible.

### G.    The '818 Patent

The '818 Patent claims "[a] video game system . . . which includes a wireless game controller which stores information about the user of the controller." ('818 Patent, Abstract, 3, ECF No. 1-1). The '818 Patent has thirteen independent claims and twenty dependent claims.

1   (*See id.* at 9–10). The Complaint alleges infringement of "at least claims 1, 20, and 24." (Compl.

2   ¶ 19).

3          1.      *Alice* Step 1

4          Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '818 Patent

5   by arguing that Claim 20 of the Patent is representative of the other claims and  is patent

6   ineligible under *Alice*.

7          Claim 20 reads:

8          A game apparatus comprising:

9          a wireless transmitter to transmit both an identification code and game control
           signals to a processor executing a game, the identification code is used by the
10         processor to retrieve identification data and authorize game play based at least in
           part on an age of a player; and a plurality of input controls to allow the player to
11         interact with the processor to play the game.

12   ('818 Patent, Claim 20, at 10). This claim involves three aspects: (1) the transmission of an

13   identification code and game control signals to a processor; (2) authorization to play a game

14   based on the age of a player; and (3) the use of input controls to allow a player to interact with

15   the processor to play the game.

16         Defendant argues that Claim 20 is directed to the abstract concept of authorizing access

17   to a game based on age; however, this description of the claim is not complete. The claim is

18   directed to authorizing access to a game based on age, but it is also directed to allowing a user to

19   play a game using a wireless controller. The claim describes tangible components, such as a

20   "wireless transmitter" and "input controls," *id.*, which are part of the wireless controller. The

21   patent describes "a need . . . for a video game system having a portable controller which allows

22   user to operate a video game from a remote location" and that has "portable personalized game

23   controllers" because in 1997 controllers were not wireless and could not be personalized to the

24

user. ('818 Patent, Background, at 7). The patent summary states that "the personalized wireless game controllers . . . allow[] for the custom operation of an interactive video system based upon personal data transmitted from the controller." ('818 Patent, Summary, at 7). Thus, Claim 20 is not directed simply to authorizing access to a game based on age but to carrying out that purpose by using "an arrangement of particularized computer components to implement an apparatus that never existed prior to November 1997: a video-game system with a wireless, personalized game controller." (Resp., 12, ECF No. 33). In other words, the claim has "physical and tangible components that are directed to more than performance of an abstract idea." *Chamberlain Grp., Inc. v. Linear LLC*, 114 F. Supp. 3d 614, 625 (N.D. Ill. 2015).

Defendant has not met its burden to show that Claim 20 of the '818 Patent is directed to an abstract idea; thus, the Court denies the motion to find that the '818 Patent is patent ineligible. Because Defendant does not discuss the other claims of the '818 Patent the Court need not address them in detail; however, in a cursory review the Court finds that the other claims are directed to enhancing a user's experience during a game through a personalized wireless controller that includes tangible components directed to more than performance of an abstract idea.

2.      Failure to State a Claim

Defendant also argues that Plaintiffs fail to allege sufficient facts to state a claim of infringement of the '818 Patent because Plaintiffs fail to identify any device that Defendant has offered for sale, sold, made, used, or imported. The Court agrees.

As discussed above, the claims of the '818 Patent involve physical and tangible computer components; specifically, "a processor unit," "a personalized portable controller," "control switches," "a wireless transmitter," "a removable rechargeable battery pack," "[a] game

apparatus," and "a central processing unit (CPU)." ('818 Patent, 9–10). In fact, the tangible

aspects of the claims are what helped the '818 Patent avoid dismissal under *Alice*. Thus, any

allegation of infringement of the '818 Patent must necessarily allege infringement of its tangible

aspects.

   In their Complaint, Plaintiffs allege that Defendant "has made, used, tested, imported,

provided, supplied, distributed, sold, and/or offered for sale products and/or systems that infringe

. . . one or more claims of the RE'818 Patent." (Compl. ¶ 19). They further allege that

"Defendant's accused products and/or systems provide a processor that executes a gaming

application for displaying video images on a display screen." (*Id.*). The Complaint also describes

a "personalized portable control" and "wireless transmitter." (*Id.*). However, Plaintiffs do not

provide any specific allegations identifying any actual physical device or components Defendant

has produced, used, tested, etc. Instead, they allege that Defendant operates "an interactive

website (www.bigfishgames.com) and mobile application," (Compl. ¶ 10), and that it "provides

access to its social casino gaming platform through its web-based interface and/or mobile

applications," (*id.* ¶ 13).

   If the Court takes all of Plaintiffs' material allegations as true, then it is not plausible that

Defendant has produced, used, tested, etc. any tangible computer components that could infringe

on the '818 patent because Defendant allegedly provides access to its social casino games only

through a web-based interface or mobile applications. In other words, without more specific

allegations it would be unreasonable to infer that Defendant is producing personal computers,

mobile devices, or other tangible devices that include processors, personalized portable

controllers, and control switches, rather than simply producing a website and mobile applications

through which it provides social casino games, as Plaintiffs allege.

Plaintiffs argue that the presence of hardware components is not necessary because Defendant might infringe method claims not identified in the Complaint; however, Plaintiffs do not specifically allege that Defendant infringes any method claims, and the method claims of the '818 Patent are dependent upon and intertwined with the claims that involve tangible components. (*See, e.g.*, '818 Patent, Claim 16, at 9–10 ("A method of operating an interactive video system, the method comprising: activating a processing unit; transmitting personalized information from a controller using wireless transmissions . . .")). As a whole, the '818 Patent is designed to address a video game system with tangible components, including a physical portable controller, (*see* '818 Patent, Background, at 7 ("[T]here is a need in the art for a video game system having a portable controller which allows user to operate a video game from a remote location. Further, a video game system is need[ed] which has portable personalized game controllers.")), and all its claims support that purpose.

The Court grants the motion to dismiss the claim of infringement of the '818 Patent, with leave to amend the Complaint to make plausible allegations regarding the Patent's tangible components.

## H.     The '169 Patent

The '169 Patent claims "[a] gaming system . . . [that] allows users to access applications via gaming communication devices coupled to a communication network." ('169 Patent, Abstract, 39, ECF No. 1-1). The '169 Patent has three independent claims (Claims 1, 24, 45) and sixty-two dependent claims. (*See id.* at 60–64). The Complaint alleges infringement of "at least claim 1." (Compl. ¶ 40). Defendant moves the Court to dismiss Plaintiffs' claim of infringement of the '169 Patent by arguing that Claim 1 is patent ineligible under *Alice*.

1

      1.     *Alice* Step 1

2

Claim 1 reads:

3

An apparatus comprising:

4

at least one processor; and at least one data storage device electronically coupled
to the at least one processor, the at least one data storage device operable to store:
a program, and at least one profile associated with a user of a gaming device, the
gaming device being operable to make a plurality of gaming activities available to
the user for play via the gaming device; and wherein the program, when executed
by the at least one processor, makes the at least one processor operable to at least:
update the user's profile to reflect a first success level of the user in playing a first
of the plurality of gaming activities via the gaming device during a first gaming
session; in response to a start of a second gaming session that is subsequent to a
termination of the first gaming session; in response to a start of a second gaming
session that is subsequent to a termination of the first gaming session: determine
from the user's profile at least the first success level of the user in playing the first
gaming activity during the first gaming session; based at least in part on the first
success level, modify a gaming environment, wherein the modification includes a
change as to how the first gaming activity is presented to the user as a possible
gaming activity that the user may play via the gaming device during the second
gaming session; and present to the user, via the gaming device, the first gaming
activity according to the modified gaming environment.

13

('169 Patent, Claim 1, at 60–61). This claim involves three aspects: (1) a user profile that makes

14

gaming activities available to the user; (2) a processor that updates the user's profile to reflect the

15

user's initial success; and (3) presenting a modified gaming environment based on the user's

16

initial success.

17

      Claim 1 is directed to the abstract idea of presenting a modified gaming environment

18

based on a user's prior game play. First, the claim involves collecting, recognizing, and storing

19

data which is a concept that is "undisputedly well-known" and "humans have always performed

20

these functions." *Content Extraction*, 776 F.3d at 1347. Collecting and organizing data to make a

21

profile of a person is something humans have long performed. Similarly, modifying an

22

environment based on a person's profile and past activities is not a novel concept. In the gaming

23

context, Defendant presents a compelling analogy to a real casino situation:

24

> A casino floor manager, for example, can make a certain number of entry-level poker tables available to a player (as claim 1 recites, "make a plurality of gaming activities available to the user for play"), keep a mental or written record of that player's success level ("update the user's profile to reflect a first success level"), and when the player has demonstrated a record of success, permit access to more exclusive, higher stakes tables ("based at least in part on the first success level, modify a gaming environment . . .").

(Mot., 26). Plaintiffs argue that the claim is "directed to an apparatus that enables a dynamic and personalized online gaming environment." (Resp., 16). While this characterization may be true, Plaintiffs have not presented any arguments to show that casino staff do not, or cannot, provide a dynamic and personalized gaming environment, as Defendant has described. Unlike the '818 Patent, this claim does not describe the improvement of tangible components designed to provide a solution to a technological problem; rather, the '169 Patent merely uses conventional technology to make the process of modifying a gaming environment based on a player's past experience more efficient and to provide it on a virtual platform. As discussed above, using technology to make an abstract idea more efficient is insufficient to change the nature of the idea. Claim 1 is directed to an abstract idea that is not patentable.

        2.     *Alice* Step 2

The elements of Claim 1 do not contain an inventive concept that would transform the abstract idea into a patent-eligible application. The only limitations on the abstract idea are that it involves a processor and data storage device. These physical devices do nothing more than apply longstanding, real-world gaming environments to conventional computer technology. As in *Alice*, Claim 1 "merely require[s] generic computer implementation, [which] fail[s] to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2357. The technology involved simply carries out the tasks of collecting data from a user's gaming activities to present a modified gaming environment. "Considered 'as an ordered combination,' the computer

components . . . 'add nothing that is not already present when the steps are considered separately.'" *Id.* at 2359 (alteration omitted) (quoting *Mayo*, 132 S. Ct. at 1298). For example, Claim 1 "do[es] not . . . purport to improve the functioning of the computer itself . . . [n]or do they effect an improvement in any other technology or technical field." *Id.* Rather, the claim "amount[s] to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer." *Id.* at 2360 (quoting *Mayo*, 132 S. Ct. at 1298).

Claim 1 is directed to an abstract idea that does not contain an inventive concept sufficient to transform it into a patent-eligible application. Plaintiffs argue that Claim 1 is not representative of the other claims, but they provide only one example of another claim that might differ in a footnote. Dependent Claims 2 and 3 are directed to location determination, but determining the location of a gamer is something any person could physically attempt to do, and even if it were not possible, the claims do not purport to improve any technology or provide any advancement in the field. The Court finds that Claim 1 is representative of the other claims because "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation omitted). The '169 Patent is patent-ineligible.

I.    **Willful Infringement**

Defendant argues that Plaintiffs fail to state a claim of willful infringement. In *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007), the Federal Circuit established a two-part test for determining whether willful infringement of a patent has occurred: first, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent"; and second, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in

1    the infringement proceeding) was either known or so obvious that it should have been known to

2    the accused infringer." *Id.* at 1371.

3        On June 13, 2016, the Supreme Court abrogated this test in *Halo Elecs., Inc. v. Pulse*

4    *Elecs., Inc.*, 136 S. Ct. 1923 (2016). In *Halo*, the Court held that *Seagate* properly recognizes

5    "that enhanced damages are generally appropriate under § 284 only in egregious cases";

6    however, the test "is unduly rigid, and it impermissibly encumbers the statutory grant of

7    discretion to district courts." *Id.* at 1932. Specifically, the Court found that requiring a finding of

8    objective recklessness in every case "excludes from discretionary punishment many of the most

9    culpable offenders, such as the 'wanton and malicious pirate' who intentionally infringes

10   another's patent—with no doubts about its validity or any notion of a defense—for no purpose

11   other than to steal the patentee's business." *Id.* The Court also determined that no basis exists for

12   imposing a standard of clear and convincing evidence to prove recklessness. *Id.* at 1934.

13       The Supreme Court emphasized a district court's discretion in awarding enhanced

14   damages in patent cases while noting that there are "longstanding considerations" that limit that

15   discretion. *Id.* Those considerations "limit[] the award of enhanced damages to egregious cases

16   of misconduct beyond typical infringement." *Id.* at 1935. In his concurrence, Justice Breyer adds

17   that "the Court's references to 'willful misconduct' do not mean that a court may award

18   enhanced damages simply because the evidence shows that the infringer knew about the patent

19   *and nothing more*." *Id.* at 1936 (Breyer, J., concurring) (emphasis in original).

20       Under *Halo*, Plaintiffs fail to state a claim for willful infringement because they fail to

21   allege any facts suggesting that Defendant's conduct is "egregious . . . beyond typical

22   infringement." *Id.* at 1935. Plaintiffs simply state conclusory allegations that Defendant "was

23   made aware of the . . . patents [and] . . . [its] continued use of its infringing products constitutes

24

willful and blatant infringement," (Compl. ¶ 94), and that "Defendant has acted and is continuing to act in the face of an objectively high likelihood that its actions constitute infringement of a valid patent or with reckless disregard of that likelihood," (*id.* ¶ 95). As Justice Breyer stated, alleging that Defendant only knew about the patent is insufficient to constitute willful infringement. Furthermore, although Plaintiffs allege that Defendant acted with reckless disregard of a high likelihood that its actions constitute infringement, invoking the requirements of *Seagate*, they allege no facts to support their legal theory. The Court grants Defendant's motion to dismiss the claim of willful infringement, with leave to amend.

Finally, Plaintiffs clarify that although they included a citation to the statutory provisions related to indirect infringement in its prayer for relief, (*see* Compl., ¶ 1, at 28), they are pursuing only theories of direct and/or divided infringement at this time. Thus, the Court also grants the motion to dismiss any claims of indirect infringement, with leave to amend.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 32) is GRANTED, with leave to amend within 30 days of the date of this order.

IT IS SO ORDERED.

DATED: This 29th day of August, 2016.

_____
ROBERT C. JONES
United States District Judge